Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R60

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| Preserve Partners, Inc.<br>650 South 500 West, Suite 104<br>Salt Lake City, UT 84101, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Case No. _____ |
| | : | |
| v. | : | Judge _____ |
| | : | |
| Sawmill Park Properties, LLC<br>c/o Michael J. Kenney<br>750 Communications Parkway<br>Suite 200<br>Columbus, Ohio 43214, | : | **JURY DEMAND ENDORSED HEREON** |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendant. | : | |

---

## COMPLAINT

---

Plaintiff Preserve Partners, Inc. ("Preserve Partners"), by and through its undersigned counsel, files this Complaint against Defendant Sawmill Park Properties, LLC ("Sawmill Park") (referred to herein collectively as the "Parties") and avers and alleges as follows:

1.     This case arises out of Sawmill Park's breach of contract and unjust enrichment relating to a purchase and sale agreement Preserve Partners and Sawmill Park entered into (the "Agreement") for the sale by Sawmill Park and the purchase by Preserve Partners of a parcel of real property located at 2765 Sawmill Park Drive, Columbus, Ohio and bearing Franklin County, Ohio Parcel No. 590-148081 (the "Property"). As a result of Sawmill Park's breach of the Agreement, Preserve Partners has been damaged in an amount exceeding $112,775.21, as set forth more fully below.

1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R61

## THE PARTIES

2.      At all times material hereto, Preserve Partners was and is a corporation organized under the laws of the State of Utah, with its principal place of business in Salk Lake City, Utah.

3.      At all times material hereto, Sawmill Park was and is a corporation organized under the laws of the State of Ohio, with its principal place of business in Dublin, Franklin County, Ohio.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case because Preserve Partners seeks legal and equitable relief, including damages, exceeding $25,000.

5.      This Court has personal jurisdiction over Sawmill Park pursuant to Ohio Rev. Code § 2307.382 (A) because the action arises from its transacting of business in Ohio.

6.      Venue is appropriate in this Court because the Property that is the subject of Agreement upon which Preserve Partners brings this action is situated in Franklin County, Ohio, and because Preserve Partners' claims for relief arose in whole or in part in Franklin County, Ohio,

## FACTS

7.      Preserve Partners incorporates the allegations in Paragraph 1 through 6 above as if fully restated herein.

8.      Preserve Partners and Sawmill Park entered into the Agreement for purchase and sale of the Property on or about October 18, 2019. A copy of the Agreement is attached to this Complaint as **EXHIBIT A** and is incorporated herein by reference.

9.      The Agreement governs the terms of the Parties purchase and sale of the Property, respectively.

10.     The Agreement requires Sawmill Park to pay taxes "retroactively assessed against the Property for the tax year in which the Closing occurs or any tax years prior to the tax year in which the Closing occurs." (Ex. A at Art. 8.11(c)). Sawmill Park Properties is required to "promptly pay said sum to the other party." (*Id.*).

11.     Following the execution of the Agreement in October 2019, the sale of the Property to Preserve Partners closed in January 2020. Thereafter, the Board of Education of the Dublin City School District ("BOE") filed a complaint on March 17, 2020 with the Franklin County Board of Revision ("BOR"). The complaint sought to increase the tax year 2019 valuation of the Property to the value of $10,250,000. The BOR maintained the original value, and the BOE appealed that determination. In its appeal, the BOE sought to increase the value to $10,330,000. Subsequently, the BOE filed a second complaint on March 24, 2021 which sought to increase the tax year 2020 valuation of the property to the value of $10,330,000.

12.     Based on the BOE's complaints and appeal, the BOE and Preserve Partners are negotiating a Settlement Agreement (the "Settlement Agreement") concerning the tax lien dates of January 2019 through January 2022. Under the Settlement Agreement, the payment for 2019 taxes owed is $112,775.21. This sum represents the entire year of 2019 when Sawmill Park owned the Property and was liable for the taxes owed on the same.

13.     The Agreement expressly contemplated the possibility that the BOE would seek reassessment of the taxes for years prior to the closing of the sale of the Property. Specifically, the Agreement provided:

> If after the actual figures are available as to real estate and ad valorem taxes that were estimated at Closing, it is determined that any actual proration or apportionment varies from the amounts paid or credited at Closing, or in the event real estate taxes are retroactively assessed again the Property for the tax year in which the Closing occurs or any tax years prior to the tax year in which the Closing occurs, the proration or apportionment shall be adjusted based on the actual figures

3

as soon as feasible but not later than twenty four (24) months after the Closing Date. Either party owning the other party a sum of money based on such subsequent proration(s) shall promptly pay said sum to the other party. The provisions of this Section shall survive Closing for a period of twenty four (24) months.

14.    Preserve Partners notified Sawmill Park of the $112,775.21 due and owing for the 2019 taxes on July 15, 2021. Shortly thereafter, Sawmill Park's representative(s) advised Preserve Partners that Sawmill Park did not intend to honor the terms of the Agreement and promptly pay sums due and owing for the adjusted 2019 taxes.

15.    On September 23rd, 2021, undersigned counsel sent Sawmill Park a letter through the notification provisions in the Agreement. (Ex. A at Art. 12.5). That letter, attached hereto as **EXHIBIT B**, demanded that Sawmill Park honor and fulfill its contractual obligations and pay the sum of $112,775.21 it owes for the 2019 taxes within 10 days of receipt of the letter.

16.    As of the filing of this Complaint, Sawmill Park has failed to pay sums due and owing for the 2019 taxes on the Property and/or otherwise fulfill its obligations under the Agreement.

17.    Upon information and belief, Sawmill Park has not only breached the Agreement by not promptly paying sums due and owning thereunder, but has also fraudulently transferred and/or disbursed funds paid to Sawmill Park under the Agreement to Sawmill Parks members and/or otherwise caused the entity that is Defendant Sawmill Park Properties, LLC to be undercapitalized or dissolved, in part in an effort to avoid paying sums due and owing under the Agreement.

## COUNT I (BREACH OF CONTRACT)

18.    Preserve Partners incorporates the allegations in Paragraph 1 through 17 above as if fully restated herein.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R64

19.    Preserve Partners was the purchaser of the Property located within the jurisdiction of this Court.

20.    Under the Agreement, Sawmill Park is required to taxes "retroactively assessed against the Property for the tax year in which the Closing occurs or any tax years prior to the tax year in which the Closing occurs." (Ex. A at Art. 8.11(c)).

21.    The taxes retroactively assessed against the property for tax year 2019 – when Sawmill Park owned the Property – total $112,775.21.

22.    Under the terms of the Agreement, Sawmill Park is required to promptly pay the full tax payment of $112,775.21 for tax year 2019.

23.    Despite multiple demands for payment and its contractual obligations, Sawmill Park has failed to pay amounts due and owing for taxes assessed for tax year 2019.

24.    Sawmill Park's failure to pay constitutes a breach of the Agreement.

25.    Preserve Partners has fully performed its obligations under the Agreement.

26.    As a result of Sawmill Park's breach of the Agreement, Preserve Partners has been damaged in amount to be determined at trial in excess of $112,775.21.

## COUNT II (UNJUST ENRICHMENT)

27.    Preserve Partners incorporates the allegations in Paragraph 1 through 26 above as if fully restated herein.

28.    Sawmill Park received the benefit of the use of the Property without paying the full tax value of the Property.

29.    Sawmill Park has failed to pay Preserve Partners the taxes owed on the Property for tax year 2019 when Sawmill Park owned the Property, received the benefit(s) of the Property, and was enriched by the Property.

5

30.   Sawmill Park has been unjustly enriched.

31.   It is unjust and improper to require Preserve Partners to pay taxes for the Property for tax years in which it was not the owner of the Property and not receiving the benefit(s) of the Property.

32.   Permitting Sawmill Park to retain that benefit(s) of the Property without full payment to Preserve Partners would constitute unjust enrichment at Preserve Partners' expense, in an amount to be determined at trial in excess of $112,775.21.

### COUNT III (PROMISSORY ESTOPPEL)

33.   Preserve Partners incorporates the allegations in Paragraph 1 through 32 above as if fully restated herein.

34.   Preserve Partners entered into the Agreement with Sawmill Park to purchase the Property.

35.   Sawmill Park promised to pay for all the taxes retroactively assessed against the Property for the tax year in which the Closing occurs or any tax years before the tax year in which the Closing occurs, but Sawmill Park has failed to pay those taxes and honors its promises.

36.   Preserve Partners reasonably relied to its detriment on Sawmill Park's promises.

37.   As a result of the Preserve Partners' reasonable, detrimental reliance upon Sawmill Park's promises, Preserve Partners has been damaged in an amount to be determined at trial in excess of $112,775.21.

### COUNT IV (FRAUDULENT TRANSFER UNDER OHIO LAW

38.   Preserve Partners incorporates the allegations in Paragraph 1 through 37 above as if fully restated herein.

39.     Upon information and belief, Sawmill Park has transferred the proceeds from the sale of the Property to Sawmill Park's members, or otherwise disbursed the proceeds (the "Transfers") such that the entity known as Defendant Sawmill Park Properties, LLC is undercapitalized or dissolved.

40.     Upon information and belief, this was done, in part, in an effort to avoid paying sums due and owing under the Agreement.

41.     Upon information and belief, the proceeds from the sale of the Property could have been used to satisfy Sawmill Park's debts and obligations to Preserve Partners under the Agreement.

42.     The Transfers were made with actual intent to hinder, delay or defraud creditors, including Preserve Partners.

43.     The Transfers were made without receiving a reasonable equivalent value in exchange for such transfers.

44.     Sawmill Park is presumptively insolvent as that term is defined in O.R.C. § 1336.02(A)(2) due to the Transfers.

45.     The Transfers are avoidable as fraudulent transfers pursuant to O.R.C. § 1336.04 and § 1336.05.

46.     Preserve Partners is entitled to judgment against Sawmill Park and is entitled to the remedies provided in O.R.C. § 1336.07, including the avoidance of the Transfers or monetary compensation equivalent to the value of the Transfers.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R67

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Preserve Partners, Inc. demands judgment in its favor against Defendant Sawmill Park Properties, LLC as follows:

(a) Judgment based upon the facts and claims set forth above;

(b) Compensatory and punitive damages, plus appropriate interest and prejudgment interest thereon, costs, expenses, and attorneys' fees pursuant to the terms of the Agreement;

(c) Relief pursuant to § 1336 *et seq.* of the Ohio Revised Code;

(d) Preserve Partners' attorneys' fees and the costs of this action; and

(e) Such further relief as the Court deems appropriate in equity or at law.

Respectfully submitted,

*/s/ Kara M. Mundy*
Kara M. Mundy (0091146)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-6305
Facsimile: (614) 719-5185
E-mail: kmmundy@vorys.com

*Attorney for Plaintiff Preserve Partners, Inc.*

## JURY DEMAND

Plaintiff Preserve Partners, Inc. hereby demands a jury on any and all issues so triable.

*/s/ Kara M. Mundy*
Kara M. Mundy (0091146)

8

0F756 - R68

Exhibit A

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of the _____ day of October, 2019 (the "Effective Date") by and between SAWMILL PARK PROPERTIES, LLC, an Ohio limited liability company, formerly known as "The Residences at Sawmill Park LLC" ("Seller"), and PRESERVE PARTNERS, Inc., a Utah corporation ("Purchaser").

### W I T N E S S E T H:

A.    Seller is the owner of the Property (defined below).

B.    Seller has agreed to sell and Purchaser has agreed to purchase the Property in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of $10.00 and the mutual covenants and agreements of each party to the other hereinafter set forth, the parties do hereby mutually covenant and agree as follows:

### ARTICLE I

### DEFINED TERMS

The following terms shall have the meanings ascribed to them below when used in this Agreement:

1.1    Assignment and Assumption of Leases:        an assignment and assumption of the Leases in the form of Exhibit 1.1 attached hereto and made a part hereof.

1.2    Assignment and Assumption of Contracts.        an assignment and assumption of the contracts in the form of Exhibit 1.2 attached hereto and made a part hereof.

1.3    Bill of Sale:    a bill of sale in the form of Exhibit 1.3 attached hereto and made a part.

1.4    Broker:        Newmark Knight Frank.

1.5    Closing:    the consummation of the transaction contemplated hereby.

1.6    Closing Date:    a mutually agreeable date on or before the date that is fifty-five (55) days after the expiration of the Inspection Period.

1.7    Closing Statement:    a closing statement agreed to by Seller and Purchaser showing the items and amounts to be allocated between Purchaser and Seller hereunder.

1.8    Contracts:    the contracts relating to the Property as described on Exhibit 1.8 attached hereto and made a part hereof which Purchaser chooses to assume, provided, however, the Purchaser shall be required to assume the contracts identified on Exhibit 1.8 that are "Non-Terminable."

1.9    Deed:    a general warranty deed in the form of Exhibit 1.9 attached hereto and made a part hereof.

1.10    Deposit:        $200,000.00.

1

21732722.1

1.11    Effective Date:    the date set forth in the preamble of this Agreement.

1.12    Intentionally Omitted:

1.13    Evaluation Materials:    all third party materials, documents, reports, studies and information furnished to or obtained by Purchaser concerning the Property other than the Seller's Documents.

1.14    Inspection Period:    the period commencing upon Purchaser's receipt of all of Seller's Documents, but in no event later shall such period commence on the date that is later than five (5) business days following the Effective Date, and expiring at 5:00 pm eastern time on the date thirty (30) days thereafter.

1.15    Inspections:    site, appraisal and other inspection analyses and studies of the Property and Seller's Documents, but expressly excluding any invasive testing of the Property such as, but not limited to, a so-called "phase II" environmental site assessment.

1.16    Leases:    all leases, licenses, or other written permissions to occupy the Property.

1.17    List:    OFAC's Specially Designated and Blocked Persons List.

1.18    OFAC:    the Office of Foreign Asset Control of the Department of the Treasury.

1.19    Order:    the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism.

1.20    Permitted Exceptions:    (i) easements, restrictions, covenants and agreements of record including, but not limited to, those appearing in Schedule B-II of the Title Commitment to which Purchaser does not object in accordance with Section 4.2 below and those to which Purchaser objects but which are not removed by Seller or insured over by the Title Company; (ii) the rights of Tenants in possession under the Leases; (iii) the Contracts; (iv) zoning ordinances; and (v) Taxes which are a lien but not then due and payable.

1.21    Property:    collectively, Seller's right, title and interest in and to the Real Property, all fixtures, equipment and personalty owned by Seller and located on or about the Real Property, excluding therefrom only personalty owned by Tenants (a list of all such fixtures, equipment and personalty, if any, to be conveyed is attached hereto as Exhibit 1.21 and made a part hereof), the use of appurtenant easements, whether or not of record, strips and rights-of-way abutting, adjacent, contiguous, or adjoining the Real Property, the Leases, and the Contracts.

1.22    Purchase Price    $10,350,000.00.

1.23    Real Estate:    a certain parcel of real property located at 2765 Sawmill Park Drive, Columbus, Ohio, being Franklin County, Ohio Parcel No. 590-148081, as more particularly described on Exhibit 1.23 attached hereto and made a part hereof and commonly known as Sawmill Park.

1.24    Real Property:    the Real Estate and the improvements located thereon.

1.25    Related Parties:    all directors, officers, partners, members and employees of Purchaser and Purchaser's attorneys, lenders, accountants, consultants, advisors, and potential equity

2

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R70

sources who need to know the Evaluation Materials to be provided to them for the purpose of evaluating a possible purchase of the Property.

1.26    Rent Roll:      the rent roll attached hereto as Exhibit 1.26 and made a part hereof.

1.27    Seller's Documents:      the documents and materials listed on Exhibit 1.27 attached hereto and made a part hereof.

1.28    Survey:      a survey of the Property in such form as Purchaser may desire.

1.29    Taxes: all real and personal property taxes and assessments, special or otherwise, payable in lump sums or installments which constitute a lien against the Property, in whole or in part.

1.30    Tenants:      tenants or occupants of the Property pursuant to the Leases.

1.31    Intentionally Deleted.

1.32    Title Commitment:      a commitment from Title Company, in its capacity as title insurer, to issue to Purchaser at the Closing the Title Insurance Policy.

1.33    Title Company: Title Connect, LLC, a Michigan limited liability company, Attn: Jeffrey Gunsberg.

1.34    Intentionally Omitted.

1.35    Title Insurance Policy: an ALTA Owner's Policy of Title Insurance, without standard exceptions, in the amount of the Purchase Price naming Purchaser as the insured thereunder and insuring title to the Real Property to be in good and marketable condition as required pursuant to the terms of this Agreement and subject only to the Permitted Exceptions.

## ARTICLE II

## PURCHASE AND SALE; PURCHASE PRICE

2.1    Subject to the terms and conditions herein contained, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Property for the Purchase Price.

2.2    The Purchase Price shall be paid by Purchaser to Seller at the Closing by wire transfer of funds, subject to the adjustments and prorations set forth in this Agreement and the Closing Statement.

2.3    On or before two (2) business days after the Effective Date, Purchaser shall deposit with the Title Company, in escrow, the Deposit by wire transfer of U.S. dollars. The Deposit shall be held in escrow, in an interest bearing account at a federally insured financial institution by Title Company pending the Closing and all interest earned thereon shall be deemed to be part of the Deposit. At and upon Closing, the Deposit shall be applied against the Purchase Price, or, if the transaction contemplated hereby is not consummated, delivered to Seller or Purchaser as provided herein.

## ARTICLE III

3

21732722.1

INSPECTION OF PROPERTY

3.1     Within five (5) business days after the Effective Date, Seller shall deliver the Seller's Documents, to the extent such documents are in Seller's possession or control, to Purchaser.  In the event of the termination of this Agreement, Purchaser shall promptly thereafter destroy all copies of Seller's Documents in its possession, however stored or maintained, and Purchaser shall cause all of the Related Parties to whom were delivered (in whatever format) any of Seller's Documents likewise to destroy the same promptly after termination.  This sentence shall survive termination of this Agreement.

3.2     Intentionally Omitted.

3.3     During the Inspection Period, subject to the rights of the Tenants, Purchaser shall have the right and license, upon two (2) business days' notice to Seller, and, at Seller's option, accompanied by a representative of Seller, to enter upon the Real Property to conduct on-site Inspections.  Purchaser shall not interfere with the operation of the Real Property during the conduct of the Inspections.  Purchaser shall not conduct a Phase II environmental site assessment or any other form of invasive testing or sampling without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion.  Purchaser will not initiate contact with local, state or federal environmental agencies, except through Seller.  Purchaser hereby covenants to conduct a Phase I environmental site assessment of the Real Property.  The Inspections may be conducted by Purchaser or any designee of Purchaser, including, without limitation, engineers, accountants, architects and Purchaser's employees, during normal business hours.  Purchaser shall provide to Seller copies of all inspection reports and studies of the Property obtained by Purchaser with respect to the Property if the sale does not close for any reason whatsoever.

3.4     In the event that, after conducting the Inspections, other than its environmental Inspections, Purchaser, in Purchaser's sole discretion, does not desire to proceed with the purchase of the Property, Purchaser shall so notify Seller, in writing, on or prior to the conclusion of the Inspection Period, time being of the essence of this Agreement.  In the event that, after conducting its environmental Inspections, Purchaser, in Purchaser's sole discretion, does not desire to proceed with the purchase of the Property on account of an environmental issue, Purchaser shall so notify Seller, in writing, with reasonable detail as to such issue, on or prior to the conclusion of the Inspection Period, time being of the essence of this Agreement.  In the event of such notice, Seller shall thereupon have the option for a period of fifteen (15) days within which to cure such material environmental issue, to Purchaser's satisfaction, in Purchaser's sole discretion, and to notify Purchaser thereof in which event, Purchaser's notice that it does not desire to proceed with the purchase shall be of no force or effect.  In the event that Purchaser gives either such notices, and, with respect the notice concerning its environmental Inspections, Seller is unable or unwilling to cure such material environmental issue within the applicable time period and to Purchaser's satisfaction, in Purchaser's sole discretion, this Agreement shall terminate and be of no further force or effect (with the exception of those provisions, hereof which are expressly intended to survive such termination), and Purchaser shall promptly receive a refund of the Deposit and be relieved of any and all liability under this Agreement, except such liability under this Agreement expressly stated herein to survive such termination.  Otherwise, Purchaser will be deemed to have agreed to proceed to Closing subject to and in accordance with the balance of the terms of this Agreement.  In the event Purchaser shall elect not to terminate this Agreement in accordance with the terms of this Section, subject to the remaining terms and conditions hereof, the Deposit shall immediately become non-refundable to Purchaser and shall be paid to Seller in the event of any subsequent termination of this Agreement.

3.5     (a)     During such periods of time as Purchaser is allowed to enter the Real Property pursuant to the terms of this Agreement, Purchaser shall take all steps necessary to protect the Real Property from damage by reason of its activities and, in the event of any such damage to the Real Property, Purchaser shall promptly restore or cause to be restored that portion of the Real Property so damaged to the condition

4

21732722.1

existing prior to such damage. Purchaser agrees to indemnify, defend and hold Seller harmless from and against any and all claims, losses, damages, costs and expenses (including, but not limited to, attorneys' fees and costs) threatened or real, arising out of or resulting solely from the entry onto the Real Property by Purchaser, and any activities thereon by Purchaser, its agents, employees and contractors of activities, including, but not limited to, personal injury (including death) and property damage.

(b)    Purchaser shall not permit any construction or other lien to be filed against any of the Real Property as the result of any work, labor, service or materials performed or furnished, by, for or to Purchaser, its employees, agents and/or contractors. If any such lien shall at any time be filed against the Real Property, Purchaser shall, without expense to Seller, cause the same to be discharged of record by payment, bonds, order of a court of competent jurisdiction or otherwise, within 30 days of the filing thereof. Purchaser shall indemnify, defend and hold harmless Seller against any and all claims, losses, damages, costs and expenses (including, but not limited to, attorneys' fees and costs), arising out of the filing of any such liens and/or the failure of Purchaser to cause the discharge thereof as same is provided herein.

(c)    Purchaser shall procure and continue in force and effect from and after the date Purchaser first desires to enter the Real Property, and continuing throughout the term of this Agreement, the following insurance coverages placed with a responsible insurance company licensed to do business in the State in which the Real Property is located having an A.M. Best's rating of "A-IX" or better: comprehensive general liability insurance with a combined single limit of not less than $2,000,000.00 per occurrence or commercial general liability insurance with limits of not less than $2,000,000.00 per occurrence and $2,000,000.00 aggregate. To the extent such $2,000,000.00 limit of liability is shared with multiple properties, a per location aggregate shall be included. Seller and/or its designees shall be included as additional insureds under such comprehensive general liability or commercial general liability coverage. Purchaser shall deliver to Seller a certificate of such insurance evidencing such coverage prior to the date Purchaser enters the Real Property. Such insurance may not be cancelled or amended except upon 30 days' prior written notice to Seller. The minimum levels of insurance coverage to be maintained by Purchaser hereunder shall not limit Purchaser's liability under this Section

(d)    This Section shall survive the Closing and/or the termination of this Agreement in all events.

3.6    Purchaser hereby expressly acknowledges and agrees that Purchaser has or will have, prior to the end of the Inspection Period, thoroughly inspected and examined the Property. Purchaser hereby further acknowledges and agrees that Purchaser is relying solely upon its Inspections and that Purchaser is purchasing the Property on an "AS IS", "WHERE IS" and "WITH ALL FAULTS" basis, without representations, warranties or covenants, of any kind or nature, except as expressly set forth in this Agreement or in the documents executed and delivered by Seller at Closing, including, but not limited to, the zoning of the Property, the tax consequences to Purchaser, the physical condition of the Real Property, environmental compliance, governmental approvals and compliance of the Real Property with applicable rules, regulations, ordinances and statutes. The express intention of Purchaser and Seller is that Purchaser shall purchase the Property from Seller without any representations, warranties or covenants, express or implied, from or of Seller, except as expressly set forth in this Agreement or in the documents executed and delivered by Seller at Closing. Purchaser hereby waives and relinquishes all rights and privileges arising out of, or with respect to or in relation to, any representations, warranties or covenants, whether express or implied, which may have been made or given, or which may be deemed to have been made or given, by Seller, except as expressly set forth in this Agreement or in the documents executed and delivered by Seller at Closing. Without limiting the generality of the foregoing, Purchaser hereby further acknowledges and agrees that, except as expressly set forth in this Agreement or in the documents executed and delivered by Seller at Closing, warranties of merchantability and fitness for a particular purpose are excluded from the transaction contemplated hereby, as are any warranties arising

5

from a course of dealing or usage or trade, and that Seller has not represented or warranted, and Seller does not hereby represent or warrant, except as expressly set forth in this Agreement or in the documents executed and delivered by Seller at Closing, that the Real Property now or in the future will meet or comply with the requirements of any health, environmental or safety code or regulation of the United States of America, the state where the Real Property is located, or any other authority or jurisdiction. Without limiting the generality of the foregoing, in the event Purchaser actually takes title to the Real Property, and except as expressly set forth in this Agreement or in the documents executed and delivered by Seller at Closing, Purchaser hereby assumes all risk and agrees that Seller shall not be liable to Purchaser (or Purchaser's successors and assigns) for, and Purchaser hereby expressly waives any claims it may have now or in the future against Seller on account of, any special, direct, indirect, consequential or other damages resulting or arising from or relating to the ownership, use, condition, location, maintenance, repair or operation of the Property.

3.7     Purchaser agrees to keep confidential Seller's Documents and the Evaluation Materials. None of Seller's Documents or the Evaluation Materials shall be used or duplicated by Purchaser for any purpose other than Purchaser's evaluation of a possible acquisition of the Property. Purchaser agrees to keep all of Seller's Documents and the Evaluation Materials strictly confidential; provided, however, that Seller's Documents and the Evaluation Materials may be disclosed to the Related Parties. Purchaser shall inform the Related Parties in writing prior to disclosure, of the confidential nature of the same and the Related Parties shall be directed to keep same in the strictest confidence and to use the same only for the purpose of evaluating a possible purchase by Purchaser. Purchaser will promptly, upon request of Seller, deliver to Seller copies of the Evaluation Materials. Purchaser will direct the Related Parties to whom Seller's Documents and/or the Evaluation Materials are made available to hold the same in strictest confidence and not to make any disclosures thereof and any such disclosures shall be deemed made by and be the responsibility of Purchaser. Purchaser shall indemnify, defend, and hold Seller, and each of the officers, trustees, partners, and members harmless from and against any and all claims, losses, damages, liabilities, costs and expenses (including attorneys' fees and costs) arising out of or resulting from the breach of any of the terms of this Section. This indemnity obligation shall survive the consummation of the sale contemplated hereunder or any earlier termination of this Agreement.


## ARTICLE IV

## TITLE AND SURVEY MATTERS

4.1     Within five (5) business days after the Effective Date, Seller shall deliver to Purchaser, at Seller's sole cost and expense, the Title Commitment and the underlying documents noted therein as exceptions to title. Purchaser shall have the right, at its sole cost and expense, to obtain the Survey, provided that Purchaser shall order the updated Survey within five (5) business days after Purchaser's receipt of the Title Commitment.

4.2     If written objections to the Title Commitment or the Survey (with reasonable specificity) are made by or on behalf of Purchaser prior to the expiration of the Inspection Period that the Real Property is not acceptable due to title and/or Survey matters which are not Permitted Exceptions, Seller shall have seven (7) days following the date that it receives written notice of such objections (the "Cure Period") in order to provide Purchaser with a revised Title Commitment evidencing that such objections have been remedied and/or that at Closing the Title Company will insure over the same, provided, however, it is expressly understood that Seller shall have no obligation to effect the cure of any such objections and such failure shall in no events constitute a default of Seller under this Agreement. If Seller is unable or unwilling to obtain such revised Title Commitment within the Cure Period, Purchaser shall have the option to either (a) proceed with the purchase of the Property, in which event the Permitted

6

0F756 - R74

Exceptions shall be deemed to include such objections; or (b) to terminate this Agreement upon written notice thereof to Seller on or before the seventh (7th) day following the end of the Cure Period, and, upon such written notice of termination, Purchaser shall promptly receive a refund of the Deposit, and all liabilities and rights of Purchaser and Seller under this Agreement (except those expressly provided herein to survive such termination) shall terminate.

ARTICLE V

CLOSING

Subject to Purchaser's rights to terminate this Agreement pursuant to Article III, Article IV, Article VI, Article IX and Article X hereof, Closing shall occur on or before 1:00 pm eastern time on the Closing Date (i.e., Seller shall have received all closing proceeds due Seller as of 1:00 pm eastern time on the Closing Date). At such time as the Title Company has all required executed documents and all required funds, and at such time as the Title Company is able and has committed to issue the Title Insurance Policy, the Title Company shall record all documents that are to be recorded and deliver the Closing documents to the respective parties thereto, then disburse the funds in its possession in accordance with a Closing Statement executed by Seller and Purchaser. Upon the conclusion of Closing, Seller shall deliver possession of the Real Property to Purchaser subject to the Permitted Exceptions.

ARTICLE VI

DEFAULTS

6.1     If Purchaser breaches this Agreement, then the Title Company shall deliver the Deposit to Seller as full compensation for its damages and as its sole remedy, given that the parties acknowledge and agree that actual damages are impossible to ascertain with any certainty but the Deposit is a reasonable estimate thereof. Notwithstanding the foregoing, the indemnities made by Purchaser set forth in Section 3.5, Section 3.7 and Article XI hereof shall not be deemed limited by the foregoing limitation on remedies.

6.2     If Seller breaches this Agreement, subject to notice of such breach and a ten (10) day period to cure, Purchaser shall, as its sole remedy, have the right:  (a) to declare this Agreement terminated, in which event the Deposit shall be promptly returned to Purchaser and, if, and only if, such default results from Seller's failure to convey title to the Property at the Closing, then Seller shall pay to Purchaser an amount equal to Purchaser's actual third-party expenses, including reasonable attorney's fees, reasonably incurred and paid in connection with Purchaser's due diligence and Inspections provided that such amount shall in no events exceed the sum of Fifty Thousand and 00/100 Dollars ($50,000.00), or (b) to seek specific performance of Seller's obligations hereunder (it being understood that if such remedy is denied by a court of competent jurisdiction, Purchaser shall be entitled to the remedy under Section 6.2(a) above. Any action for specific performance shall be commenced, if at all, on or before the date sixty (60) days after the alleged breach, failing which Purchaser shall have no further right to seek specific performance and Purchaser's sole remedy on account of any such breach shall thereupon be the remedy under Section 6.2(a) above.

6.3     Notwithstanding Section 6.2 above, in the event of a default by Seller, Seller shall have the right, but not the obligation, to cure, or attempt to cure the default before Purchaser may exercise its rights granted under Section 6.2, provided Seller cures such default within ten (10) days of Seller's receipt of written notice of such default from Purchaser, it being understood by Seller and Purchaser that the Closing Date will be extended for such ten (10) day period.

7

21732722.1

## ARTICLE VII

## REPRESENTATIONS , WARRANTIES AND COVENANTS

7.1    (a)    Seller represents and warrants as follows:

(i)    Rent Roll.  The Rent Roll is a true and correct list of all Leases presently in force, security deposits, rental amounts, rental arrears and other information set forth in the Rent Roll, in all material respects.

(ii)    Non-Foreign Person.  Seller is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code.

(iii)    Employees.  Seller has no employees at the Real Property and is not a party to any collective bargaining agreement.

(iv)    Authority.  Seller has the right to execute this Agreement and to sell the Property without obtaining the consent, approval, release, or signature of any other party.  The signatories hereto on behalf of Seller have been duly authorized to execute and deliver this Agreement and to bind Seller hereto.  Seller has full power to consummate the transaction described in this Agreement, the execution and delivery of this Agreement by Seller and the consummation by Seller of the transaction described herein has been duly and validly authorized by all necessary action and the observance of all required formalities on the part of Seller such that this Agreement constitutes a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms.

(v)    No Conflict.  Neither the execution and delivery of this Agreement nor the consummation by Seller of the transaction contemplated hereby will (A) conflict with or result in a breach of or default under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which Seller is a party or by which it or the Property is bound, or (B) violate any order, injunction, decree, statute, rule or regulation applicable to Seller or the Property.

(vi)    PATRIOT Act.  Neither Seller nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of OFAC (including those named on the List) or under any statute, executive order (including the Order), or other governmental action.

(vii)    Leases.  To Seller's knowledge, there are no consents required to assign any of the Leases to Purchaser. To Seller's knowledge, all Leases are in writing and there are no oral agreements between Seller and any of the Tenants modifying any of the Leases.  Seller has delivered to Purchaser, or provided Purchaser with access to, true, correct and complete copies of all of the Leases, including, without limitation, all modifications, supplements and amendments thereto.

(viii)    Contracts.  Exhibit 1.8 is a list of all service, maintenance, supply, leasing, brokerage, listing or other contracts (along with all amendments and modifications thereof) affecting the Property. Except for the Contracts listed on Exhibit 1.8 which Purchaser chooses to assume or those that are indicated as "Non-Terminable", there are no service, management, maintenance or other similar type agreements or contracts relating to the operation, management or maintenance of the Property which shall survive the Closing or for which Purchaser shall have any liability or obligation.  To

8

Seller's knowledge, all of the Contracts are in full force and effect and, to Seller's knowledge, free from material default.

(ix)     No Lawsuits.    There are no material or uninsured claims, lawsuits or proceedings pending, or to Seller's knowledge, threatened against or relating to Seller or the Property, including, without limitation any such claims, lawsuits or proceedings which would (A) adversely affect the ability of Seller to perform its obligations under this Agreement, (B) be binding on Purchaser from and after the Closing, (C) adversely affect the use or operation of the Property or any portion thereof or (D) render title uninsurable at standard rates.

(x)   Compliance with Laws.

(A)   To Seller's actual knowledge, the Property and its current use, and the location of the improvements on the Real Estate are in compliance with all applicable laws, rules, or regulations. Seller has received no written notice alleging that the Property is in violation of applicable laws, rules, or regulations.

(B) INTENTIONALLY DELETED.

(xi)     No Bankruptcy.    Seller has not: (A) filed any voluntary or had involuntarily filed against it in any court or with any governmental body pursuant to any statute either of the United States or of any State, a petition in bankruptcy or insolvency or seeking to effect any plan or other arrangement with creditors, or seeking the appointment of a receiver; (B) had a receiver, conservator, or liquidating agent or similar person appointed for all or a substantial portion of its assets; (C) suffered the attachment or other judicial seizure of all, or substantially all of its assets; (D) given notice to any person or governmental body of insolvency; or (E) made an assignment for the benefit of its creditors or taken any other similar action for the protection or benefit of its creditors. Seller is not insolvent nor will be rendered insolvent by the consummation of the transactions under this Agreement.

(xii)     Insurance.    Seller has, at all times throughout its ownership of the Property, had the Property insured against loss or damage from such hazards and risks as, to Seller's knowledge and reasonable belief, are customarily insured with respect to similarly situated properties, including commercial property and general liability insurance.    All premiums with respect to such insurance policies have been timely paid, and the Seller has otherwise complied in all material respects with the terms and conditions of such insurance policies.

(xiii)     Condemnation.    Seller has not received any written notice of nor does it have actual knowledge of any existing or threatened condemnation or other legal action of any kind involving the Seller and/or Property.

(xiv)     Taxes.    Seller is not aware of any tax complaint or appeal filed by Seller or any governmental authority or other party.    In the event that a complaint or appeal is filed or received by Seller, Seller shall immediately forward a copy of such appeal to Purchaser.

(xv)     Seller's Documents.    To Seller's actual knowledge, none of Seller's Documents contains any untrue statement of a material fact or omits to state a fact necessary to make the statement of fact contained therein not misleading in any material respect.

(b)     Purchaser expressly authorizes Seller to make whatever inquiries and disclosures with respect to Purchaser as Seller shall require, including, but not limited to, those required in connection with a credit investigation (e.g., with Dunn & Bradstreet or other credit reporting agency) and those in connection with the USA PATRIOT Act.

9

7.2     Survival:     The representations and warranties of Seller contained in this Agreement shall survive for a period (the "Survival Period") of six (6) months after the Closing. In connection with the foregoing, to the extent claims of Losses (defined below) are not made to Seller in the form of a written notice on or before the expiration of the Survival Period, then, thereafter, any such claims shall be forever barred, waived, released and discharged. This Section 7.2 shall survive Closing.

7.3     Indemnification by the Seller:     Any limitation contained herein to the contrary notwithstanding:

(a)     From and after the Closing, but subject to the terms of Section 7.2 above and Section 7.3(b) below, Seller shall indemnify and hold Purchaser, its affiliates, members and partners, and the partners, shareholders, officers, directors, employees, representatives and agents of each of the foregoing harmless from and against any and all costs, fees, expenses, damages, deficiencies, interest and penalties (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by any such indemnified party in connection with any and all losses, liabilities, claims, damages and expenses (collectively, "Losses"), arising out of, or in any way relating to breach of any representation or warranty of Seller contained in this Agreement and discovered subsequent to Closing. The foregoing indemnity shall be deemed to include actual Losses only, and not punitive, indirect or consequential damages. In the event Purchaser becomes aware of any such Losses or the likelihood of such Losses, Purchaser shall give prompt written notice to Seller and Seller shall have the right and opportunity to defend against such Losses with counsel selected by Seller. In no event shall Seller be liable for any Losses relating to any breach of any representation or warranty contained herein, if Purchaser had knowledge of such breach prior to Closing ("knowledge" being deemed to include information gleaned by Purchaser from its Inspections and as set forth in Seller's Documents), and Purchaser elects to proceed to Closing notwithstanding the same.

(b)     In addition to the limitations set forth in Section 7.2, Purchaser acknowledges and agrees that that (i) Seller shall have no liability to Purchaser for any Losses unless claims of Losses exceed, individually or collectively in the aggregate, the sum of $10,000.00 (the "Floor"), (ii) recovery against Seller for any Losses shall be limited in all events to the sum of $250,000.00 in the aggregate (the "Cap"), and (iii) in no event shall Purchaser be entitled to seek or obtain consequential, indirect or punitive damages. The foregoing Cap shall not apply to the indemnification provided by Seller in Article XI hereof.

(c)     This Section 7.3 shall survive Closing.

7.4     Purchaser represents and warrants as follows:

(a)     Authority.     Purchaser has the right to execute this Agreement and to purchase the Property without obtaining the consent, approval, release, or signature of any other party. The signatories hereto on behalf of Purchaser have been duly authorized to execute and deliver this Agreement and to bind Purchaser hereto. Purchaser has full power to consummate the transaction described in this Agreement, the execution and delivery of this Agreement by Purchaser and the consummation by Purchaser of the transaction described herein has been duly and validly authorized by all necessary action and the observance of all required formalities on the part of Purchaser such that this Agreement constitutes a valid and legally binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

(b)     No Conflict.     Neither the execution and delivery of this Agreement nor the consummation by Purchaser of the transaction contemplated hereby will (i) conflict with or result in a breach of or default under any of the terms, conditions or provisions of any note, bond, mortgage,

10

indenture, license, agreement or other instrument or obligation to which Purchaser is a party, or (ii) violate any order, injunction, decree, statute, rule or regulation applicable to Purchaser.

(c)  PATRIOT Act. Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of OFAC (including those named on the List) or under any statute, executive order (including the Order), or other governmental action. Within 10 days after the Effective Date, Purchaser shall submit to Seller an organizational chart of Purchaser showing the names of all owners of interests, and percentages owned, whether direct or indirect, in Purchaser, such chart showing each level of ownership on down to the live body individuals that directly or indirectly own Purchaser, such chart showing the employer identification numbers and social security numbers of each such owner and each owner's home and business address.

7.5  Indemnification by the Purchaser:  Any limitation contained herein to the contrary notwithstanding:

(a)  From and after the Closing, Purchaser shall indemnify and hold Seller, its affiliates, members and partners, and the partners, shareholders, officers, directors, employees, representatives and agents of each of the foregoing harmless from and against any and all costs, fees, expenses, damages, deficiencies, interest and penalties (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by any such indemnified party in connection with any and all Losses, arising out of, or in any way relating to breach of any representation or warranty of Purchaser contained in this Agreement and discovered subsequent to Closing. The foregoing indemnity shall be deemed to include actual Losses only, and not punitive, indirect or consequential damages. In the event Seller becomes aware of any such Losses or the likelihood of such Losses, Seller shall give prompt written notice to Purchaser and Purchaser shall have the right and opportunity to defend against such Losses with counsel selected by Purchaser. In no event shall Purchaser be liable for any Losses relating to any breach of any representation or warranty contained herein, if Seller had knowledge of such breach prior to Closing, and Seller elects to proceed to Closing notwithstanding the same.

(b)  This Section 7.5 shall survive Closing.

During the pendency of this Agreement, Seller shall operate, maintain, repair and lease the Real Property in accordance with its historical practices.

ARTICLE VIII

CLOSING DOCUMENTS AND DELIVERIES

On the Closing Date, Seller shall execute and deliver to Purchaser (as required) and Purchaser shall execute and deliver to Seller (as required) the following:

8.1  Purchaser shall deliver the Purchase Price (net of any prorations and adjustments set forth herein) by wire transfer of readily available funds to the Title Company.

8.2  Seller shall execute and deliver to the Title Company the Deed.

8.3  Seller shall execute and deliver to Purchaser the Assignment and Assumption of Leases. On the Closing Date, Seller shall deliver to Purchaser the originally executed Leases or copies thereof if

11

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R79

the originals are not in Seller's possession and control (unless previously delivered).  Purchaser shall execute a counterpart of the Assignment and Assumption of Leases and deliver same to Seller at Closing.

8.4     Seller shall execute and deliver to Purchaser the Assignment and Assumption of Contracts for those Contracts that are assumable and must be assigned.  On the Closing Date, Seller shall deliver to Purchaser the originally executed Contracts or copies thereof if the originals are not in Seller's possession and control.  Purchaser shall execute a counterpart of the Assignment and Assumption of Contracts and deliver same to Seller at Closing.

8.5     Seller shall deliver to Purchaser all existing plans and specifications in Seller's possession relating to the Real Property.

8.6     Seller shall execute and deliver the Bill of Sale to Purchaser.

8.7     Seller shall deliver to the Title Company such evidence of Seller's authority to enter into this transaction which is reasonably required by the Title Company.

8.8     Seller shall execute and deliver such affidavit as is acceptable to Seller in its commercially reasonable discretion as the Title Company may reasonably require (provided the same shall not contain any indemnification of the Title Company by Seller and the same shall expire on the date 15 days after Closing and the matters asserted therein shall be limited, in all events, to the "knowledge without inquiry or duty of inquiry" of Seller's representative making the same) to remove its standard printed exceptions relating to, among other things, construction liens and rights of parties in possession, but not with respect to matters of survey.

8.9     Seller shall deliver to Purchaser a notice to the tenants of the change of ownership of the Property in the form of Exhibit 8.9 attached hereto and made a part hereof.

8.10     Seller shall deliver to the Title Company an affidavit stating that Seller is not a "Foreign Person" within the meaning of the Internal Revenue Code.

8.11     Seller and Purchaser shall execute and deliver to each other the Closing Statement showing the amounts by which the Purchase Price shall be adjusted as of the Closing Date and in the following manner:

(a)     Seller shall pay all commitment, search and exam fees for the Title Commitment and the premium for the Title Insurance Policy and the cost of deleting the standard exceptions, provided that Seller shall only be required to provide a standard owner's affidavit.  Purchaser shall pay the cost of any endorsements Purchaser shall require.  Purchaser shall pay all costs associated with the Survey.  Seller shall pay all transfer taxes associated with the delivery of the Deed and all recording fees for the recording of the Deed.

(b)     Seller and Purchaser shall share equally the escrow charges charged by the Title Company.

(c)     All real estate and ad valorem taxes on the Real Property for the calendar year in which the Closing occurs shall be prorated between Seller and Purchaser to the date of the Closing, and all real estate and ad valorem taxes on the Real Property for any prior calendar years, including penalties and interest, shall be paid or credited in full by Seller at or prior to the Closing.  Seller shall pay any and all assessments, charges and special taxes which are a lien on the Real Property at the date of the Closing or which are attributable to improvements that have theretofore been completed.  For purposes of this

12

21732722.1

Agreement, any tax rates and property valuations that are not determined at the time of the Closing for the Real Property shall be determined upon the tax rate for the immediately preceding year applied to the Purchase Price, and shall be prorated based upon a 365-day year. If after the actual figures are available as to real estate and ad valorem taxes that were estimated at Closing, it is determined that any actual proration or apportionment varies from the amounts paid or credited at Closing, or in the event real estate taxes are retroactively assessed against the Property for the tax year in which the Closing occurs or any tax years prior to the tax year in which the Closing occurs, the proration or apportionment shall be adjusted based on the actual figures as soon as feasible but not later than twenty four (24) months after the Closing Date. Either party owing the other party a sum of money based on such subsequent proration(s) shall promptly pay said sum to the other party. The provisions of this Section shall survive Closing for a period of twenty four (24) months.

(d)     Purchaser shall receive credit for all security and cleaning deposits, if any, held by Seller on the Closing Date which Seller is required to have in its possession or control pursuant to the terms of any Lease.

(e)     Seller shall pay all water, sewer, and utility charges, common area maintenance charges, and other operating expenditures through the day before the Closing Date. If final readings have not been taken, estimated charges shall be prorated between the parties and appropriate credits given, and post-closing adjustments shall be made when the actual billings are received.

(f)     Rentals paid by Tenants and received by Seller prior to the Closing Date shall be prorated between the parties with rentals applicable to the period from and after the Closing Date allocated to Purchaser. Unpaid and delinquent rent collected by Seller and Purchaser after the Closing Date will be delivered as follows: (i) if Seller collects any unpaid or delinquent rent for the Property, Seller will, within thirty (30) days after the receipt thereof, deliver to Purchaser any such rent which Purchaser is entitled to hereunder relating to the date of Closing and any period thereafter, and (ii) if Purchaser collects any unpaid or delinquent rent from the Property, Purchaser will, within thirty (30) days after the receipt thereof, deliver to Seller any such rent which Seller is entitled to hereunder relating to the period prior to the Closing Date. Seller and Purchaser agree that all rent received by Seller or Purchaser will be applied first to rents that were due and payable in the month of Closing; second, to those rents that are due and payable after Closing; and third, to those rents that are due and payable prior to the month of Closing. Purchaser will use commercially reasonable efforts after Closing to collect all rents in the usual course of Purchaser's operation of the Property for a period of three (3) months, but Purchaser will not be obligated to institute any lawsuit or other collection procedures to collect delinquent rents.

(g)     Any amounts payable by or to Seller under any of the Contracts assigned hereunder shall be prorated between the parties as of the Closing Date and appropriate credits given, with Purchaser attributed with the period of time from and after Closing.

(h)     Any closing costs not described in clauses (a) - (g) above shall be paid as customary for similar transactions in Columbus, Ohio.

ARTICLE IX

DAMAGE

In the event that any improvements located upon the Property shall be damaged or destroyed by fire, storm or other casualty before the Closing Date and the cost to repair such casualty shall exceed $500,000.00, then Purchaser shall have the right to terminate this Agreement by providing to Seller a

13

21732722.1

written notice of termination within fifteen (15) days after receiving notice of such fire, storm or other casualty and upon such termination, anything herein contained to the contrary notwithstanding, and, the Deposit shall be refunded to Purchaser. In the event Purchaser shall not elect to terminate this Agreement or in the event Purchaser fails timely to terminate this Agreement pursuant to the foregoing or in the event of any damage or destruction to such improvements the cost of repair for which is less than $500,000.00 (for which no termination right shall apply under this Article IX), Purchaser shall be entitled to receive at Closing an absolute assignment from Seller of any interest Seller may have otherwise had in the proceeds of any insurance on the Property (including any rent loss insurance allocable to the period from and after the Closing Date) less any costs incurred by Seller in securing such proceeds and/or adjusting the loss and/or in undertaking any required repairs and Purchaser shall proceed with the Closing on the Property in its then "as-is" condition with no reduction in the Purchase Price.

### ARTICLE X

### CONDEMNATION

10.1    In the event that, between the Effective Date and the Closing Date, any condemnation or eminent domain proceedings are initiated which would result in the taking of any "material part" (as hereinafter defined) of the Real Property or the buildings and improvements located on the Real Estate, Purchaser may:

(a)    terminate this Agreement by providing written notice to Seller and receive a refund of the Deposit (within the time periods provided for in Section 10.2 below); or

(b)    proceed with the Closing, in which event Seller shall assign to Purchaser at Closing all of Seller's right, title and interest in and to any award made in connection with any such condemnation or eminent domain proceedings, with the Property being in its then "as is" condition with no reduction to the Purchase Price.

10.2    Seller shall promptly notify Purchaser in writing if Seller has actual knowledge of the commencement or occurrence of any condemnation or eminent domain proceedings. Purchaser shall then notify Seller, within ten (10) days of Purchaser's receipt of Seller's notice, which of Purchaser's rights Purchaser elects to exercise under Section 10.1(a) or (b). If Purchaser fails to make an election within such ten (10) day period, Purchaser shall be deemed to have elected to exercise Purchaser's rights under Section 10.1(b). As used in this Article X, "material part" shall mean ten percent (10%) or more of the Real Property based upon value.

### ARTICLE XI

### BROKER

Purchaser represents and warrants that it has not been represented by any broker in connection with the purchase of the Property. Seller represents and warrants that it has been represented in this transaction by Broker and that Seller will be responsible for the commission due Broker in the event of Closing pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and hold the other harmless from any loss, cost, liability or expense (including reasonable attorneys' fees and costs) on account of the indemnifying party's breach of this Article XI.

### ARTICLE XII

14

21732722.1

## MISCELLANEOUS

12.1     This Agreement and the exhibits attached hereto embody the entire agreement between the parties in connection with this transaction and there are no oral or parole agreements existing between the parties relating to this transaction which are not expressly set forth herein and covered hereby; this Agreement may not be modified except in writing signed by all parties.

12.2     Failure of either party to complain of any act or omission on the part of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by such party to any of its rights hereunder. No waiver by any party at any time, expressed or implied, of any breach of any provision of this Agreement shall be deemed a waiver or a breach of any other provision of this Agreement or a consent to any subsequent breach of the same or any other provision. If any action by any party shall require the consent or approval of another party, such consent or approval of such action on any one occasion shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any action on the same or any subsequent occasion.

12.3     The captions, section numbers and article numbers appearing in this Agreement are inserted only as a matter of convenience, and do not define, limit, construe or describe the scope or intent of such sections or articles of this Agreement nor in any way affect this Agreement.

12.4     No party other than Seller and Purchaser and their successors and assigns, shall have any rights to enforce or rely upon this Agreement, which is binding upon and made solely for the benefit of Seller and Purchaser and their successors and assigns, and not for the benefit of any other party.

12.5     All notices provided for or permitted to be given pursuant to this Agreement must be in writing. All notices to be sent hereunder shall be deemed to have been properly given or served: if hand delivered by courier, in hand when received; if mailed, on the third business day following the date upon which the same is deposited in the United States mail, addressed to the recipient of the notice, certified with return receipt requested; if by e-mail, on the date sent (or the next business day after the date of transmission if the transmission day is not a business day) and that a duplicate notice was forwarded via nationally recognized overnight courier guarantying next day delivery; and, if by nationally recognized overnight courier guarantying overnight delivery, on the business day following the day such notice was deposited with such a courier, so long as the day of deposit was on a service day of such courier and prior to the last pick up for such day.

|  |  |
|---|---|
| If to Seller: | Sawmill Park Properties, LLC<br>c/o National Equity<br>121 W. Long Lake Road, Suite 300<br>Bloomfield Hills, Michigan 48304<br>E-mail: paul@nationalequitygroup.com<br>Attention: Paul Ross |
| With a copy to: | Lumberg Freeman Gleeson Hicks & Khalil PLLC<br>33 Bloomfield Hills Parkway, Suite 100<br>Bloomfield Hills, Michigan 48304<br>E-mail: alumberg@lfglawfirm.com<br>Attention: Adam P. Lumberg, Esq. |
| If to Purchaser: | Preserve Partners, Inc.<br>2019 Main Street, Suite 2 |

15

21732722.1

Salt Lake City, UT 84115
E-mail: max.rosendin@preservepartners.com
Attention: Max Rosendin

With a copy to:

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
E-mail: njreis@vorys.com
Attention: Nicklaus J. Reis, Esq.

12.6    This Agreement shall be governed by the laws of the State of Ohio.

12.7    This Agreement may be executed in any number of counterparts, each of which, when taken together, shall be deemed to be one and the same instrument. Executed copies of this Agreement may be delivered between the parties via telecopy or electronic mail.

12.8    Neither Purchaser nor Seller shall record this Agreement or any memorandum thereof in any public records or make any press release or other public disclosure concerning the transaction contemplated hereby and each party shall use its diligent and commercially reasonable efforts to prevent disclosure of the transaction contemplated hereby prior to Closing, other than (a) to directors, trustees and officers and members or shareholders of the parties or any qualified intermediary in connection with a like kind exchange of real estate associated herewith, and employees, agents, bankers, attorneys, accountants, consultants and affiliates of the parties who are involved in the ordinary course of business with the transaction contemplated hereby, and to the Title Company and Purchaser's consultants who are retained to investigate the Property, all of which shall be instructed to comply with the non-disclosure provisions hereof, and/or (b) in response to lawful process or subpoena or other valid or enforceable order of a court of competent jurisdiction. This Section 12.8 shall survive the expiration or earlier termination of this Agreement, anything herein contained to the contrary notwithstanding.

12.9    Purchaser may not assign this Agreement or its rights hereunder without the prior written consent of Seller, which consent may be withheld in its sole discretion and any such consented to assignment by Purchaser shall not release Purchaser from liability hereunder. Notwithstanding the foregoing, Purchaser shall have the right, without Seller's prior consent thereto, to assign its rights in this Agreement to any entity majority owned or controlled by Purchaser's principals in connection with Closing.

12.10    Except as otherwise expressly provided herein, no representations, warranties, covenants, agreements or other obligations in this Agreement shall survive the Closing, and no action based thereon shall be commenced after the Closing Date.

12.11    Seller reserves the right to effectuate the sale of the Property by means of an exchange of "like-kind" property which will qualify as such under Section 1031 of the Code and the regulations promulgated thereunder. Seller expressly reserves the right to assign its rights, but not its obligations, hereunder to a qualified intermediary as provided in I.R.C. Reg. 1.1031(k)-1(g)(4) on or before the date of Closing. Upon written notice from Seller to Purchaser, Purchaser agrees to cooperate with Seller to effect a like-kind exchange, provided that such cooperation shall be subject to the following conditions: (a) such exchange shall not delay the date of Closing by more than fifteen (15) days and shall occur either simultaneously with the Closing or the sale proceeds payable to Seller shall be paid to a third party Title Company or intermediary and title conveyed to Purchaser, such that Purchaser shall not be required to participate in any subsequent closing, (b) Purchaser shall not be obligated to spend any sums or occur any

16

0F756 - R84

expenses in excess of the sums and expenses which would have been spent or incurred by Purchaser if there had been no exchange, and (c) Purchaser shall not be obligated to acquire, accept title to or convey any property other than the property to be conveyed to Purchaser pursuant to this Agreement.

12.12   As used herein, the phrase "business days" shall be deemed to mean all days other than Saturdays, Sundays and legal holidays in the state in which the Real Property is located and those days on which banking institutions in such state are authorized by law to close for business.   .

12.13   Purchaser shall have the right and option (the "SPE Option"), exercisable by delivery of written notice delivered to Seller at any time prior to the Closing, to elect to effect the transfer of the Property hereunder through the transfer to Purchaser of all of the ownership interests in a newly-formed single purpose entity (an "SPE") that will own the Property as of the date of Closing.  Any restructuring of the purchase of the Property hereunder will include (i) Seller forming a new SPE in a form and state of organization that is reasonably acceptable to Purchaser and having a name of Purchaser's choosing, and contributing the Property to such SPE utilizing a limited warranty deed in form reasonably acceptable to Purchaser by and/or through a wholly-owned subsidiary of Seller should Seller so choose, at or prior to Closing, (ii) Seller providing to Purchaser any and all due diligence and other information reasonably requested by Purchaser with regard to the SPE (and the conveyance of the Property to any such SPE), and (iii) Purchaser approving the forms of organizational documents of the SPE. In the event that Purchaser exercises the SPE Option, Seller shall assign its membership interest in the SPE to Purchaser pursuant to an assignment of membership interest in a form reasonably acceptable to Purchaser.

[END OF TEXT – SIGNATURES ON FOLLOWING PAGES]

17

21732722.1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

PRESERVE PARTNERS, INC., a Utah corporation

By: *Raymond M. Rosendin*

Name: Raymond Rosendin

Its: President

"Purchaser"

Dated: October 17 , 2019

0F756 - R86

SAWMILL PARK PROPERTIES, LLC,
an Ohio limited liability company

By: _____

Name: _PAUL ROSS_____

Its: _MEMBER_____

"Seller"

Dated: _OCTOBER 18_, 2019

21732722 1

19

## DEPOSIT ACKNOWLEDGMENT

The undersigned hereby acknowledges receipt of the Deposit and agrees to hold the same pursuant to terms of the Agreement. The liability of the undersigned is limited by the terms and conditions expressly set forth herein and by the laws of the state in which the Property is located and in no event shall the liability of the undersigned exceed the amount of the Deposit. The undersigned shall have no liability whatsoever on account of or occasioned by any failure or negligence on the part of any bank, savings and loan or other savings institution wherein the Deposit is deposited, provided, however, that such institution is, at the time of deposit of the Deposit, federally insured. In the event of litigation affecting the duties of the undersigned as Title Company relating to this Agreement and the Deposit, Seller and Purchaser, jointly and severally, shall reimburse the undersigned for all expenses incurred by the undersigned, including reasonable attorneys' fees, unless such litigation results from or is caused by the gross negligence or misfeasance of the undersigned. In the event of any dispute between Seller and Purchaser pertaining to the Deposit, the undersigned may commence an interpleader action and deposit the Deposit with a court of competent jurisdiction and in such event, the undersigned shall be relieved of all further obligation and liability.

_____.

By: _____
Name: _____
Its: _____

Address:

_____

_____
Phone: _____
Fax: _____
E-mail: _____

Dated: _____, 2019

20

21732722.1

0F756 - R88

Exhibit List

| | |
|---|---|
| Exhibit 1.1 | Assignment and Assumption of Leases |
| Exhibit 1.2 | Assignment and Assumption of Contracts |
| Exhibit 1.3 | Bill of Sale |
| Exhibit 1.8 | List of Contracts |
| Exhibit 1.9 | Deed |
| Exhibit 1.21 | Personalty List |
| Exhibit 1.23 | Legal Description |
| Exhibit 1.26 | Rent Roll |
| Exhibit 1.27 | Seller's Documents |
| Exhibit 8.9 | Notice to Tenants |

21

## EXHIBIT 1.1

### ASSIGNMENT AND ASSUMPTION OF LEASES

KNOW ALL MEN that _____ , a _____ ("Assignor"), in consideration of Ten ($10.00) Dollars and other good and valuable consideration, received from _____ , a _____ ("Assignee"), does hereby assign, transfer and deliver unto Assignee, all of its right, title and interest in and to the leases set forth in the rent roll attached to Schedule A annexed hereto, together with all security deposits presently held by Assignor in connection therewith (collectively, the "Leases") affecting the premises located at 2765 Sawmill Park Drive, Columbus, Ohio more particularly described on Schedule B annexed hereto.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, forever, from and after the date hereof, subject to the terms, covenants, conditions and provisions hereof and of said Leases.

AND Assignee does hereby acknowledge receipt of said Leases (including the security deposits) so delivered, and does hereby (a) accept the within assignment, (b) assume the performance of all of the terms, covenants and conditions of the said Leases on the part of the lessor/Assignor thereunder which are to be performed or arise from and after the date hereof, and (c) indemnify, defend and hold Assignor free and harmless from and against any and all costs, expenses, claims, losses or damages, liabilities and judgments (including reasonable attorneys' fees and disbursements) which Assignor may suffer in respect of any claim arising out of or relating to any default on the part of Assignee to perform said terms, covenants and conditions of the Leases or in any way relating to the security deposits and arising from and after the date hereof.

AND Assignor does hereby indemnify, defend and hold Assignee free and harmless from and against any and all costs, expenses, claims, losses or damages (including reasonable attorneys' fees and disbursements) which Assignee may suffer in respect of any claim arising out of or relating to any default on the part of Assignor to perform said terms, covenants and conditions of the Leases or in any way relating to the security deposits and arising prior to the date hereof.

This assignment and assumption agreement shall inure to the benefit of Assignee and Assignor and their respective successors and assigns and shall be governed by the laws of the State of Ohio. This assignment and assumption agreement may not be modified, altered or amended, or its terms waived, except by an instrument in writing signed by the parties hereto.

None of the provisions of this instrument are intended to be, nor shall they be construed to be, for the benefit of any third party.

[Signatures appear on following page]

Exhibit 1.1

21732722.1

SIGNATURE PAGE TO
ASSIGNMENT AND ASSUMPTION OF LEASES


IN WITNESS WHEREOF, Assignor and Assignee have only executed this assignment and assumption agreement this _____ day of _____, 201__.


_____,
a _____


By: _____
Name: _____
Its: _____

"Assignor"


_____,
a _____


By: _____
Name: _____
Its: _____

"Assignee"


Exhibit 1.1 continued

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R91

## SCHEDULE A TO ASSIGNMENT AND ASSUMPTION OF LEASES

### Rent Roll

Exhibit 1.1 continued

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088

0F756 - R92

## SCHEDULE B TO ASSIGNMENT AND ASSUMPTION OF LEASES

### Legal Description

Exhibit 1.1 continued

21732722.1

**EXHIBIT 1.2**

**ASSIGNMENT AND ASSUMPTION OF CONTRACTS**

KNOW ALL MEN that _____, a_____ ("Assignor"), in consideration of Ten ($10.00) Dollars and other good and valuable consideration, received from _____ ("Assignee"), does hereby assign, transfer and deliver unto Assignee, all of its right, title and interest in and to those certain contracts relating to the operation or maintenance of the premises located at 2765 Sawmill Park Drive, Columbus, Ohio, which contracts are listed in Schedule A annexed hereto (the "Contracts").

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, forever, from and after the date hereof, subject to the terms, covenants, conditions and provisions contained herein and therein.

AND Assignee does hereby acknowledge receipt of the Contracts so delivered, and does hereby (a) accept the within assignment; (b) assume the performance of all of the terms, covenants and conditions of the Contracts to be performed or arise thereunder by Assignor from and after the date hereof; and (c) indemnify and hold Assignor free and harmless from and against any and all costs, expenses, claims, losses or damages, liabilities and judgments (including reasonable attorneys' fees and disbursements) which Assignor may suffer in respect of any claim arising out of or relating to any default on the part of Assignee to perform said terms, covenants and conditions of the Contracts and arising from and after the date hereof.

AND Assignor does hereby indemnify and hold Assignee free and harmless from and against any and all costs, expenses, claims, losses or damages, liabilities and judgments (including reasonable attorneys' fees and disbursements) which Assignee may suffer in respect of any claim arising out of or relating to any default on the part of Assignor to perform said terms, covenants and conditions of the Contracts and arising prior to the date hereof.

This assignment and assumption agreement shall inure to the benefit of Assignee and Assignor and their respective successors and assigns, and shall be governed by the laws of the State of Ohio. This assignment and assumption agreement may not be modified, altered or amended, or its terms waived, except by an instrument in writing signed by the parties hereto.

None of the provisions of this instrument are intended to be, nor shall they be construed to be, for the benefit of any third party.

[Signatures appear on following page]

Exhibit 1.2

21732722.1

0F756 - R94

SIGNATURE PAGE TO
ASSIGNMENT AND ASSUMPTION CONTRACTS


IN WITNESS WHEREOF, Assignor and Assignee have executed this assignment and assumption agreement this _____ day of _____, 201__.


ASSIGNOR:

_____,

a _____


By: _____
Name: _____
Its: _____


ASSIGNEE:

_____,

a _____


By: _____
Name: _____
Its: _____


Exhibit 1.2 continued

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R95

SCHEDULE A TO ASSIGNMENT AND ASSUMPTION OF CONTRACTS

<u>List of Contracts</u>

Exhibit 1.2 continued

21732722.1

## EXHIBIT 1.3

## BILL OF SALE

FOR $1.00 RECEIVED as of _____, 201__ and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, _____ _____, a _____ ("Assignor"), does hereby quit claim, assign, transfer, convey and deliver to _____, a _____ ("Assignee), the undivided right, title and interest in and to the personal property (the "Personal Property") situated on and/or used in connection with the operation of that certain real property more particularly described on <u>Schedule A</u> attached hereto and incorporated herein by reference, which Personal Property is more particularly described on <u>Schedule B</u> attached hereto and made a part hereof .

Assignor covenants and warrants to Assignee that Assignor is the lawful owner of the Personal Property, and that Assignor has full right, power and authority to sell and transfer the Personal Property as provided herein. Assignor, for itself, its successors and assigns, hereby covenants and agrees to and with Assignee, its successors and assigns, to warrant and defend the sale of the Personal Property hereby made to Assignee, its successors and assigns, against any and every person or persons whatsoever.

This Bill of Sale shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of Ohio.

IN WITNESS WHEREOF, Assignor has executed this Bill of Sale.

_____,

a _____

By: _____
Name: _____
Its: _____

"Assignor"

Exhibit 1.3

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088

0F756 - R97

SCHEDULE A TO BILL OF SALE

Legal Description

Exhibit 1.3 continued

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R98

SCHEDULE B TO BILL OF SALE

<u>Personal Property</u>

Exhibit 1.3 continued

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - R99

**EXHIBIT 1.8**

<u>LIST OF CONTRACTS</u>

<u>[To be provide by Seller within five (5) days after the Effective Date]</u>

Exhibit 1.8

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - S1

**EXHIBIT 1.9**

**DEED**

**GENERAL WARRANTY DEED**

SAWMILL PARK PROPERTIES, LLC, a Ohio limited liability company ("**Grantor**"), for valuable consideration paid, grant, with general warranty covenants, to _____, a \_\_\_ _____, whose tax-mailing address is _____, the real property described in **Exhibit A** attached hereto and made a part hereof (the "**Property**").

> **Parcel No.**: 590-148081-00

> **Prior Instrument References**: Instrument Number _____, Recorder's Office, Franklin County, Ohio (the "Public Records").

The Property conveyed hereby is made subject to: (i) easements, conditions, restrictions and reservations set forth in the Public Records, (ii) real property taxes and assessments, (iii) applicable zoning and building laws, and (iv) rights of the public in legal highways.

[SIGNATURE PAGE FOLLOWS]

Exhibit 1.9

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088

0F756 - S2

IN WITNESS WHEREOF, Grantor has executed this General Warranty Deed as of _____, 20___.

**GRANTOR:**

SAWMILL PARK PROPERTIES, LLC,
an Ohio limited liability company

By:_____

STATE OF MICHIGAN                    )
                                     ) SS.
COUNTY OF _____       )

This instrument was acknowledged before me in _____ County, Michigan, on _____, 20___, by _____, _____ of SAWMILL PARK PROPERTIES, LLC , an Ohio limited liability company, on behalf of said company.

_____
Print Name of Notary Public: _____
Notary Public, State of Michigan, County of _____.
My commission expires: _____.
Acting in the County of _____.

Drafted by and when recorded return to:

_____
_____
_____
_____

Exhibit 1.9 continued

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - S3

**Exhibit A**

**Legal Description**

Exhibit 1.9 continued

21732722.1

**EXHIBIT 1.21**

**PERSONALTY LIST**

All furniture, fixtures and equipment owned by Seller and located on the Real Property and used exclusively at the Real Property.

Exhibit 1.21

21732722.1

## EXHIBIT 1.23

## LEGAL DESCRIPTION

DESCRIPTION OF A 3.861 ACRE TRACT OF LAND
LOCATED BETWEEN ABBEY CHURCH ROAD AND
SAWMILL ROAD AND NORTH OF CASE ROAD,
IN THE CITY OF COLUMBUS,
COUNTY OF FRANKLIN, STATE OF OHIO

Situated in the State of Ohio, County of Franklin, City of Columbus, being in Quarter Township 3, Township 2 North, Range 19 West, United States Military Lands, containing 3.861 acres of land, more or less, said 3.861 acres being out of the residue of that 52.604 acre tract of land described in Exhibit "A" in the deed to the Columbus Jewish Foundation, of record in Instrument No. 199802130033793, Recorder's Office, Franklin County, Ohio, said 3.861 acres being more particularly described as follows:

Beginning, for reference, at a Franklin County Monument (FCGS 0051) found at the intersection of the centerline of West Case Road and the centerline of Sawmill Road; thence N04°14'45"E, with the centerline of said Sawmill Road, as it is shown and delineated on the Dedication Plat of Sawmill Road and Abbey Church Road, of record in Plat Book 58, Page 27, Recorder's Office, Franklin County, Ohio, a distance of 1930.70 feet to a point in said centerline; thence N 85°13'30" W, crossing the easterly line of Quarter Township 4 and the westerly line of Quarter Township 3, at a distance of 12 feet, a total distance of 60.00 feet to a 3/4-inch (I.D.) iron pipe found at the true point of beginning, at the southeasterly corner of said residue of 52.604 acre tract, said iron pipe also being in the westerly right-of-way line of said Sawmill Road and also being at a northeasterly corner of that 13.5410 acre tract of land described in the deed to Abbey Church Village, L.P., of record in Official Record 28213E07, Recorder's Office, Franklin County, Ohio;

Thence, from said true point of beginning, N 85°13'30" W, with a southerly line of said residue of 52.604 acre tract and with a northerly line of said 13.541 acre tract, a distance of 559.86 feet to a 3/4-inch (I.D.) iron pipe found at the southwesterly corner of said residue of 52.604 acre tract at the northwesterly corner of said 13.541 acre tract, said iron pipe being in the easterly line of Lot No. 79 of Wyandotte Trail, Section 1, a subdivision of record in Plat Book 75, Pages 65, 66 and 67, Recorder's Office, Franklin County, Ohio;

Thence N 04°13'59" E, with a westerly line of said residue of 52.604 acre tract, in part, with an easterly line of both, said Lot No. 79 and Reserve "A" in said Wyandotte Trail, Section 1, and, in part, with the easterly right-of-way line of said Abbey Church Road, crossing a 3/4-inch (I.D.) iron pipe found at a point of tangency in the easterly right-of-way line of said Abbey Church Road at a distance of 291.95 feet, a total distance of 300.04 feet to a 3/4-inch (I.D.) iron pipe found in the easterly right-of-way line of said Abbey Church Road at the northwesterly corner of said residue of 52.604 acre tract, said iron pipe also being at the southwesterly corner of that 3.857 acre tract of land described in the deed to Bernard R. Ruben, of record in Official Record 5400A13, Recorder's Office, Franklin County, Ohio;

Thence S 85°17'24" E, with the northerly line of said residue of 52.604 acre tract and with the southerly line of said 3.857 acre tract, a distance of 559.92 feet to a 3/4-inch (I.D.) iron pipe set in the westerly right-of-way line of said Sawmill Road at a northeasterly corner of said residue of 52.604 acre tract and at the southeasterly corner of said 3.857 acre tract;

Thence S 04°14'45" W, parallel with and 60.00 feet westerly from, as measured at right angles, the centerline of said Sawmill Road, with an easterly line of said residue of 52.604 acre tract and with the westerly right-of-way line of said Sawmill Road, a distance of 300.68 feet to the true point of beginning and containing 3.861 acres of land, more or less.

The bearings given in the foregoing description correspond to the bearing of S 04°14'45" W as given for the centerline of Sawmill Road and as shown on the Dedication Plat of Sawmill Road and Abbey Church Road, of record in Plat Book 58, Page 27, Recorder's Office, Franklin County, Ohio.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088
0F756 - S6

**EXHIBIT 1.26**

**RENT ROLL**

**(See Attached)**

Exhibit 1.26

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088

0F756 - S7

Tricap Chicago, LLC - Sawmill Park
RENT ROLL DETAIL
10/16/2019 04:11 PM
As of Date: 10/16/2019
Parameters: Properties: - all subproperties ; Show All Unit Designations or Filter by: ALL; Subjournals: ALL; Sort by: Unit; Report Type: Details + Summary; Exclude Feeness?: Yes; Show Unit Rent as: Market +

| Unit | Floorplan | Unit Designation | SQFT | Unit/Lease Status | Name | Move-In | Move-Out | Lease Start | Lease End | Market + Addl. | Sub Journal | Required Deposit | Dep On Hand | Balance | Lease Rent | RENT | PETRENT | GARAGE | EMPLCRED | MODEL | Total Billing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088**

0F756 - S8

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2820 | B1 | N/A | 544 | Occupied | Russell, Mamed | 12/12/2019 | 12/12/2019 | 12/07/2019 | 99.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 834.00 | 834.00 | 0.00 | 0.00 | 0.00 | 0.00 | 834.00 |
| 2821 | B1 | N/A | 544 | Occupied | Karnu, Paulee | 02/23/2019 | | 02/23/2019 | 08/24/2020 | 388.00 | RESIDENT | 0.00 | 0.00 | -99.00 | 877.00 | 877.00 | 0.00 | 0.00 | 0.00 | 0.00 | 877.00 |
| 2824 | A1 | N/A | 752 | Occupied | Kheokware, Mohamed | 07/25/2019 | | 07/25/2019 | 10/24/2020 | 915.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 765.00 | 765.00 | 0.00 | 0.00 | 0.00 | 0.00 | 765.00 |
| 2825 | B1 | N/A | 544 | Occupied | Islam, Toyeshi | 09/14/2019 | | 09/14/2019 | 09/15/2020 | 588.00 | RESIDENT | 0.00 | 0.00 | -1.00 | 849.00 | 849.00 | 0.00 | 0.00 | 0.00 | 0.00 | 849.00 |
| 2826 | A1 | N/A | 752 | Occupied | Wilder, Elizabeth | 03/11/2019 | | 03/11/2019 | 03/11/2020 | 915.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 791.00 | 791.00 | 0.00 | 0.00 | 0.00 | 0.00 | 791.00 |
| 2827 | B1 | N/A | 544 | Occupied | Mohammed, Taha | 09/20/2019 | | 09/20/2019 | 09/14/2020 | 585.00 | RESIDENT | 195.00 | 195.00 | 2.00 | 592.00 | 592.00 | 0.00 | 0.00 | 0.00 | 0.00 | 592.00 |
| 2828 | B1 | N/A | 544 | Occupied | Dominguez, Edgar | 05/04/2019 | | 05/04/2019 | 04/26/2020 | 800.00 | RESIDENT | 150.00 | 150.00 | 0.00 | 834.00 | 834.00 | 0.00 | 0.00 | 0.00 | 0.00 | 834.00 |
| 2829 | B1 | N/A | 544 | Occupied | Ley, Kely | 10/11/2019 | | 10/11/2019 | 10/05/2020 | 800.00 | RESIDENT | 150.00 | 0.00 | 0.00 | 927.00 | 927.00 | 70.00 | 0.00 | 0.00 | 0.00 | 997.00 |
| 2830 | B1 | N/A | 544 | Occupied | Lumus, Britney | 03/15/2017 | | 04/08/2019 | 03/31/2020 | 800.00 | RESIDENT | 0.00 | 9.00 | 57.00 | 834.00 | 834.00 | 0.00 | 0.00 | 0.00 | 0.00 | 939.00 |
| 2831 | B1 | N/A | 544 | Occupied | Barera, Chandra-Sekhar | 01/14/2019 | | 03/03/2019 | 02/26/2020 | 800.00 | RESIDENT | 30.00 | 90.00 | -1.77 | 939.00 | 939.00 | 0.00 | 35.00 | 0.00 | 0.00 | 914.00 |
| 2834 | A1 | N/A | 752 | Vacant-Leased | VACANT | | | | 819.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2834 | A1 | N/A | 752 | Applicant | Lavatar, Naomi | 10/26/2019 | | 10/26/2019 | 04/20/2021 | | RESIDENT | 0.00 | 0.00 | 0.00 | 844.00* | 844.00* | 0.00 | 0.00 | 0.00 | 0.00 | 844.00* |
| 2835 | S1 | N/A | 544 | Occupied | Kasar, Lauren | 07/10/2019 | | 07/10/2019 | 06/27/2020 | 600.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 849.00 | 849.00 | 0.00 | 0.00 | 0.00 | 0.00 | 849.00 |
| 2836 | A1 | N/A | 752 | Occupied | Naik, Amaya | 12/07/2015 | | 11/25/2019 | 11/24/2019 | 810.00 | RESIDENT | 99.00 | 99.00 | 0.00 | 800.00 | 800.00 | 0.00 | 0.00 | 0.00 | 0.00 | 800.00 |
| 2836 | A1 | N/A | 752 | Pending removal | Naik, Amaya | 12/07/2019 | | 11/25/2019 | 05/23/2020 | | RESIDENT | 99.00 | 0.00 | 0.00 | 879.00* | 879.00* | 0.00 | 0.00 | 0.00 | 0.00 | 879.00* |
| 2837 | B1 | N/A | 544 | Occupied | Azsize-Giini, DeAnna | 05/17/2019 | | 05/21/2019 | 05/15/2020 | 800.00 | RESIDENT | 150.00 | 150.00 | 0.00 | 816.00 | 816.00 | 36.00 | 50.00 | 0.00 | 0.00 | 936.00 |
| 2838 | B1 | N/A | 544 | Occupied | Walfe, Alicia | 05/04/2019 | | 05/04/2019 | 04/21/2020 | 875.00 | RESIDENT | 150.00 | 150.00 | 920.00 | 828.00 | 828.00 | 0.00 | 0.00 | 0.00 | 0.00 | 828.00 |
| 2839 | B1 | N/A | 544 | Occupied | Lombardo, Stacy | 10/05/2019 | | 10/05/2019 | 09/22/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 873.00 | 873.00 | 35.00 | 0.00 | 0.00 | 0.00 | 909.00 |
| 2840 | B1 | N/A | 544 | Occupied | Gantwell, Christian | 03/19/2019 | | 03/18/2019 | 06/18/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 793.00 | 793.00 | 0.00 | 0.00 | 0.00 | 0.00 | 793.00 |
| 2841 | B1 | N/A | 544 | Occupied | Parameswaram, Jagamanikandan | 04/11/2019 | | 04/11/2019 | 04/05/2020 | 875.00 | RESIDENT | 150.00 | 150.00 | 0.00 | 835.00 | 835.00 | 0.00 | 0.00 | 0.00 | 0.00 | 835.00 |
| 2844 | A1 | N/A | 752 | Occupied | Jabour, Ali | 01/31/2019 | | 01/27/2019 | 01/22/2020 | 810.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 782.00 | 782.00 | 0.00 | 0.00 | 0.00 | 0.00 | 782.00 |
| 2845 | B1 | N/A | 544 | Occupied | Milbrasus, Mitchell | 09/11/2019 | | 09/11/2019 | 09/05/2020 | 800.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 852.00 | 852.00 | 0.00 | 0.00 | 0.00 | 0.00 | 852.00 |
| 2846 | A1 | N/A | 752 | Occupied | Moore, Callyon | 06/26/2019 | | 06/26/2019 | 06/18/2020 | 810.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 804.00 | 804.00 | 70.00 | 0.00 | 0.00 | 0.00 | 874.00 |
| 2847 | B1 | N/A | 544 | Occupied | Smith, Doug | 04/02/2019 | | 04/02/2019 | 03/22/2020 | 800.00 | RESIDENT | 190.00 | 190.00 | -4.54 | 834.00 | 834.00 | 0.00 | 0.00 | 0.00 | 0.00 | 834.00 |
| 2848 | B1 | N/A | 544 | Occupied | Wong, Gaoyong | 06/07/2012 | | 02/26/2019 | 09/14/2020 | 875.00 | RESIDENT | 250.00 | 250.00 | 0.00 | 877.00 | 877.00 | 0.00 | 0.00 | 0.00 | 0.00 | 877.00 |
| 2849 | B1 | N/A | 544 | Occupied | Parkvash, Kamath | 01/10/2019 | | 01/08/2019 | 01/03/2020 | 585.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 929.00 | 929.00 | 35.00 | 0.00 | 0.00 | 0.00 | 855.00 |
| 2850 | B1 | N/A | 544 | Occupied | Tanner, Alex | 03/13/2019 | | 03/13/2019 | 02/29/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 815.00 | 815.00 | 0.00 | 0.00 | 0.00 | 0.00 | 815.00 |
| 2851 | S1 | N/A | 544 | Occupied | Dawei-Jacquee, Michelle | 02/01/2019 | | 01/28/2019 | 01/23/2020 | 875.00 | RESIDENT | 150.00 | 150.00 | 0.00 | 833.00 | 833.00 | 0.00 | 0.00 | 0.00 | 0.00 | 833.00 |
| 2854 | B1 | N/A | 544 | Occupied | Modena, Roth | 09/23/2019 | | 09/23/2019 | 12/22/2020 | 800.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 803.00 | 803.00 | 0.00 | 0.00 | 0.00 | 0.00 | 803.00 |
| 2855 | B1 | N/A | 544 | Occupied-NTV | Mayahoos, Edar | 10/24/2015 | 12/07/2019 | 11/15/2019 | 11/19/2019 | 800.00 | RESIDENT | 250.00 | 200.00 | 0.00 | 880.00 | 880.00 | 0.00 | 110.00 | 0.00 | 0.00 | 990.00 |
| 2856 | B1 | N/A | 544 | Occupied | Reyulu, Ramesh | 06/26/2011 | | 09/13/2019 | 03/31/2020 | 800.00 | RESIDENT | 250.00 | 250.00 | 0.00 | 907.00 | 907.00 | 0.00 | 0.00 | 0.00 | 0.00 | 907.00 |
| 2857 | B1 | N/A | 544 | Occupied | Begum, Kohinoor | 12/08/2017 | | 12/30/2019 | 12/23/2019 | 800.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 800.00 | 800.00 | 0.00 | 0.00 | 0.00 | 0.00 | 800.00 |
| 2859 | A1 | N/A | 752 | Occupied | Dagley, Montgomery | 01/02/2019 | | 03/04/2019 | 02/27/2020 | 810.00 | RESIDENT | 99.00 | 99.00 | 0.00 | 850.00 | 850.00 | 0.00 | 0.00 | 0.00 | 0.00 | 850.00 |
| 2856 | B1 | N/A | 544 | Occupied | Sargil, Hannah | 07/09/2019 | | 07/13/2019 | 07/07/2020 | 585.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 848.00 | 848.00 | 0.00 | 0.00 | 0.00 | 0.00 | 848.00 |
| 2860 | A1 | N/A | 752 | Occupied | Lamel, Abhy | 07/15/2019 | | 07/15/2019 | 07/14/2020 | 815.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 779.00 | 779.00 | 0.00 | 0.00 | 0.00 | 0.00 | 779.00 |
| 2861 | B1 | N/A | 544 | Occupied | Williams, Candace | 11/28/2018 | | 11/28/2018 | 11/23/2019 | 855.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 834.00 | 834.00 | 0.00 | 0.00 | 0.00 | 0.00 | 834.00 |
| 2861 | B1 | N/A | 544 | Pending removal | Williams, Candace | 11/28/2018 | | 11/24/2019 | 11/19/2020 | | RESIDENT | 0.00 | 0.00 | 0.00 | 910.00* | 910.00* | 0.00 | 0.00 | 0.00 | 0.00 | 910.00* |
| 2864 | B1 | N/A | 544 | Occupied | Flora-Cruz, Rene | 06/23/2017 | | 06/15/2019 | 06/09/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 883.00 | 883.00 | 0.00 | 0.00 | 0.00 | 0.00 | 983.00 |
| 2865 | B1 | N/A | 544 | Occupied | Ingram, Nathaniel | 07/26/2019 | | 07/26/2019 | 07/27/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 841.00 | 841.00 | 0.00 | 0.00 | 0.00 | 0.00 | 841.00 |
| 2866 | B1 | N/A | 544 | Occupied | Bilal, Shram | 14/07/2019 | | 13/07/2019 | 12/30/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | -0.40 | 917.00 | 917.00 | 0.00 | 0.00 | 0.00 | 0.00 | 917.00 |
| 2867 | B1 | N/A | 544 | Occupied | Haberuch, Tyler | 02/01/2019 | | 01/28/2019 | 01/22/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 787.00 | 787.00 | 0.00 | 0.00 | 0.00 | 0.00 | 787.00 |
| 2868 | A1 | N/A | 752 | Vacant | VACANT | | | | 810.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2869 | B1 | N/A | 544 | Occupied | Steinhaur, Michelle | 05/15/2019 | | 05/14/2019 | 05/08/2020 | 800.00 | RESIDENT | 150.00 | 150.00 | 0.00 | 810.00 | 810.00 | 0.00 | 0.00 | 0.00 | 0.00 | 810.00 |
| 2870 | A1 | N/A | 752 | Occupied | Buckley, Brittany | 12/22/2017 | | 12/18/2019 | 12/13/2019 | 810.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 774.00 | 774.00 | 0.00 | 0.00 | 0.00 | 0.00 | 774.00 |
| 2870 | A1 | N/A | 752 | Pending removal | Buckley, Brittany | 12/22/2017 | | 12/14/2019 | 06/11/2020 | | RESIDENT | 0.00 | 0.00 | 0.00 | 855.00* | 855.00* | 0.00 | 0.00 | 0.00 | 0.00 | 855.00* |
| 2871 | B1 | N/A | 544 | Occupied | Baez, Secan | 03/01/2019 | | 03/01/2019 | 09/03/2020 | 800.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 800.00 | 800.00 | 33.00 | 0.00 | 0.00 | 0.00 | 835.00 |
| 2874 | S1 | N/A | 544 | Occupied | Evans, Destiny | 07/25/2019 | | 07/25/2019 | 07/12/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 2.00 | 938.00 | 938.00 | 0.00 | 0.00 | 0.00 | 0.00 | 938.00 |
| 2875 | B1 | N/A | 544 | Occupied | Jeckvor, Olivia | 02/04/2019 | | 02/04/2019 | 12/28/2019 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 839.00 | 839.00 | 0.00 | 0.00 | 0.00 | 0.00 | 839.00 |
| 2876 | B1 | N/A | 544 | Occupied | Gaimr, San | 02/02/2017 | | 02/25/2019 | 02/20/2020 | 875.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 875.00 | 875.00 | 35.00 | 0.00 | 0.00 | 0.00 | 910.00 |
| 2877 | B1 | N/A | 544 | Occupied | Mentz, Allan | 07/09/2018 | | 07/26/2019 | 07/20/2020 | 875.00 | RESIDENT | 99.00 | 99.00 | -39.78 | 894.00 | 894.00 | 0.00 | 0.00 | 0.00 | 0.00 | 894.00 |
| 2878 | A1 | N/A | 752 | Occupied | Tiara, Adam | 09/21/2019 | | 09/17/2019 | 09/11/2020 | 810.00 | RESIDENT | 0.00 | 0.00 | 0.00 | 850.00 | 850.00 | 0.00 | 55.00 | 0.00 | 0.00 | 905.00 |
| 2879 | B1 | N/A | 544 | Occupied | Smith, Kimarji | 08/01/2017 | | 08/16/2019 | 08/10/2020 | 800.00 | RESIDENT | 0.00 | 0.00 | 907.00 | 877.00 | 877.00 | 0.00 | 0.00 | 0.00 | 0.00 | 877.00 |
| 2880 | A1 | N/A | 752 | Occupied-NTVL | Kaltenrieder, Julie | 09/19/2019 | 11/14/2019 | 08/16/2019 | 10/14/2019 | 810.00 | RESIDENT | 0.00 | 0.00 | 569.00 | 1,033.00 | 1,033.00 | 35.00 | 0.00 | 0.00 | 0.00 | 1,068.00 |
| 2880 | A1 | N/A | 752 | Applicant | Ferguson, Stefanny | 11/26/2019 | | 11/26/2019 | 11/20/2020 | | RESIDENT | 150.00 | 0.00 | 0.00 | 820.00* | 820.00* | 0.00 | 0.00 | 0.00 | 0.00 | 820.00* |
| 2881 | B1 | N/A | 544 | Occupied | Morkaas, David | 10/05/2019 | | 10/01/2019 | 09/25/2020 | 150.00 | | 150.00 | -10.00 | 903.00 | 903.00 | 0.00 | 0.00 | 0.00 | 0.00 | 903.00 |

| Totals: | | | | | | | | | | 105,385.00 | | 8,247.00 | 7,929.00 | 7,113.03 | 100,510.00 | 100,510.00 | 865.00 | 1,385.25 | -530.50 | -889.00 | 101,190.75 |

* Indicates amounts not included in detail totals

**EXHIBIT 1.27**

**SELLER'S DOCUMENTS**
*to the extent in Seller's actual possession or control*

1.  Copy of the most recent title insurance policy in Seller's possession

2.  Copies of all current leases

3.  Copies of the most recent environmental site assessment reports in Seller's possession, if any

4.  Copies of the most recent zoning reports in Seller's possession, if any

5.  Copies of the most recent property condition report in Seller's possession, if any

6.  All operating statements for 2017, 2018 and all twelve (12) month statements for each of the previous calendar years and trailing 12 months

7.  Current rent roll

8.  Move-in/move-outs per month since construction

9.  Work Orders for the past 12 months

10. Receipted real estate tax bills for the past three years and any correspondence with local assessors or board of revisions for the current tax year

11. Copies of all current service contracts in force

12. All utility bills for the past year

13. Aged Delinquency Reports for each of the past six (6) months

14. Summary of capital expenditures made since acquisition. List each item of repair and the date on which it was completed

15. Most recent fire and life safety inspection reports by governing authorities and private contractors

16. List all of recurring services that are not contracted for (include vendor, cost and frequency) and a list of all vendors used in the past 12 months

17. Copy of any existing appraisals & O&M manuals

18. Copy of any existing termite report and bond guarantee

19. Listing and explanation of any pending litigation

Exhibit 1.31

21732722.1

20.   List of personal property including maintenance parts inventory

21.   Description of any factor that might change or reduce the current use of the property (e.g. eminent

domain, street widening, easements, reciprocal parking or occupancy agreements, change in

access, contingencies, etc.)

22.   Copy of any notices received by any governing authorities

23.   Standard form lease

24.   Site plan and Alta Survey and copies of any building plans and/or permits

25.   Access to: (a) All leases and lease files, including retail/commercial tenants; (b) as built plans and

specifications

26.   Copies of five (5) years insurance loss history

27.   Copies of Certificates of Occupancy

28.   Copies of any physical assessments

Exhibit 1.22 continued

21732722.1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Jan 05 11:33 AM-22CV000088

0F756 - S11

**EXHIBIT 8.9**

**NOTICE TO TENANTS**

_____, 201__

_____
_____
_____
_____

Re:    Sale of Apartment Building
       2765 Sawmill Park Drive, Columbus, Ohio

Please be advised that on _____, 20__, _____ conveyed the apartment property located at 2765 Sawmill Park Drive, Columbus, Ohio and assigned your lease to _____ _____. Your security deposit, if any, transferred to the new owner.

All amounts due prior to the conveyance remain payable to _____.  Beginning with your next payment, your rent should be sent to _____ at _____, _____ _____, _____.

                    Sincerely

                    _____

                    By:_____
                    Name:_____
                    Its:_____

Exhibit 8.9

**THIS PAGE INTENTIONALLY LEFT BLANK**

0F756 - S12



Vorys, Sater, Seymour and Pease LLP
Legal Counsel

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Kara M. Mundy
Direct Dial  (614) 464-5669
Direct Fax  (614) 719-4709
Email kmmundy@vorys.com

| Exhibit B |

September 23, 2021

**VIA OVERNIGHT CARRIER AND E-MAIL**

Paul Ross
Sawmill Park Properties, LLC
c/o National Equity
121 W. Long Lake Road, Suite 300
Bloomfield Hills, Michigan 48304
paul@nationalequitygroup.com

Adam P. Lumberg
Lumberg Freeman Gleeson Hicks & Khalil PLLC
33 Bloomfield Hills Pkwy #100
Bloomfield Hills, Michigan 48304
alumberg@lfglawfirm.com

Re:   **Taxes Owed by Sawmill Park Properties, LLC**
       **2765 Sawmill Park Drive, Columbus, Ohio**

Dear Messrs. Ross and Lumberg:

This firm represents Preserve Partners, Inc. ("Preserve Partners") in its efforts to collect taxes assessed on property located at 2765 Sawmill Park Drive, Columbus, Ohio (the "Property"). Pursuant to a Purchase and Sale Agreement entered into between Preserve Partners, Inc. and Sawmill Park Properties, LLC ("Seller") on or about October 18, 2019 (the "Purchase and Sale Agreement"), Seller is obligated to pay taxes "retroactively assessed against the Property for the tax year in which the Closing occurs or any tax years prior to the tax year in which the Closing occurs." (Purchase and Sale Agreement at Art. 8.11(c).)  Seller is required to "promptly pay said sum to the other party." (*Id.*)

Following the sale of the Property to Preserve Partners in October 2019, the Board of Education of the Dublin City School District ("BOE") filed a complaint on March 17, 2020 with the Franklin County Board of Revision ("BOR") seeking to increase the tax year 2019 valuation of the Property to the value of $10,250,000.  When the original value was maintained, the BOE

0F756 - S13

# VORYS
Legal Counsel

Paul Ross
Adam Lumberg
September 23, 2021
Page 2

filed an appeal of the BOR's decision, and sought to increase the value to $10,330,000. Subsequently, the BOE filed a second complaint on March 24, 2021 seeking to increase the tax year 2020 valuation of the Property to the value of $10,330,000.

Based on the BOE's filings, the BOE and Preserve Partners entered into a Settlement Agreement (the "Settlement Agreement") concerning the tax lien dates of January 2019 through January 2022. Pursuant to the Settlement Agreement, the payment for 2019 taxes owed is $112,775.21. In accordance with the parties' Purchase and Sale Agreement, Seller is responsible for the payment of $112,775.21. This sum represents the entire year of 2019 when Seller owned the Property and was liable for the taxes owed on same.

Notification of the $112,775.21 due and owing was made to Seller's counsel by counsel to Preserve Partners on July 15, 2021. Shortly thereafter, Seller's representative(s) advised that Seller did not intend to honor the terms of the Purchase and Sale Agreement.

Please let this correspondence serve as Preserve Partners' formal demand for the payment of $112,775.21, representing the amount of 2019 taxes owed by the Seller pursuant to the parties' Purchase and Sale Agreement. Preserve Partners demands that this sum be paid to it within 10 days of receipt of this correspondence. If full payment is not promptly forthcoming, please be advised that this firm has been authorized by Preserve Partners to file suit against Seller for breach of the Purchase and Sale Agreement. In the event that the Seller has dissolved or intends to dissolve Sawmill Park Properties, LLC, Preserve Partners will also pursue causes of action for fraud, fraudulent inducement, and avoidance of fraudulent conveyances under Ohio Revised Code § 1336.

Upon receipt of this correspondence, please contact me to arrange prompt payment of the 2019 taxes owed on the Property.

Very truly yours,

Kara M. Mundy

KMM/kmm